## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN J. FEINSTEIN, M.D., et al., | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | |
| vs. | : | NO. 10-4050 |
| | : | |
| SAINT LUKE'S HOSPITAL, et al., | : | |
| Defendants | : | |

## M E M O R A N D U M

**STENGEL, J.**                                          **October     , 2011**

This is a fourteen-count action brought under the Employee Retirement Income Security Act of 1974 ("ERISA"),[1] 29 U.S.C. § 1001, et seq., by Steven J. Feinstein, M.D., and Albert P. Sarno, M.D., against their former employer Saint Luke's Hospital and the administrators of its pension plans. The plaintiffs are seeking injunctive and declaratory relief in addition to monetary compensation for denied and lost pension benefits. They allege various ERISA violations and state law claims. The defendants filed a motion to dismiss the complaint in its entirety, to which the plaintiffs have responded. I held a hearing on the motion. For the following reasons, I will grant the motion in its entirety. Further, I will decline to exercise supplemental jurisdiction over the remaining state law claims.

---

[1] ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 137 (1990) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90 (1983)). The statute imposes participation, funding, and vesting requirements on pension plans. It also sets various uniform standards, including rules concerning reporting, disclosure, and fiduciary responsibility, for both pension and welfare plans. Id. As part of this closely integrated regulatory system, Congress included various safeguards to preclude abuse and "to completely secure the rights and expectations brought into being by this landmark reform legislation." Id.

## I.     BACKGROUND[2]

The plaintiffs are both perinatologists who were employed by Saint Luke's Hospital from January 1991 and August 1993, respectively, until late November 2008. See Compl. ¶¶ 14-16.  Saint Luke's is the sponsor of a qualified pension plan for its employees, and a non-qualified pension plan known as the Executive Retirement Benefit Restoration Plan (the "Restoration Plan" or the "Plan").  The plaintiffs participated in both plans.  Id. ¶¶ 17, 20.  The Restoration Plan resulted from a change to the Internal Revenue Service Code in 1993 that lowered the maximum salary that a qualified pension plan could recognize when determining an employee's pension benefit.  Accordingly, Saint Luke's adopted a non-qualified pension benefit plan that allowed it to "restore" the amounts that would have been paid into the qualified pension plan but for the new IRS limitations.  Id. ¶ 18.

The complaint alleges that in 2008 there had been an employment dispute between the hospital and the physicians.  Id. ¶ 21.  Attempts were made to resolve the dispute, but allegedly the hospital halted the attempts and abruptly terminated both employees on November 30, 2008.  Id.  This allegation becomes significant because if the physicians were involuntarily terminated, they would be eligible to receive Restoration Plan benefits.  If they voluntarily terminated their employment before the age of 65, those

---

[2] The facts are gleaned from the complaint and the extrinsic documents upon which it is based.  See GSC Partners, CDO Fund v. Washington, 368 F.3d 228, 236 (3d Cir. 2004).  For the purposes of this motion, they are presented in the light most favorable to the plaintiffs, as the non-moving parties, and are accepted as true with all reasonable inferences drawn in their favor.

benefits would not be available.[3]  The defendants allegedly threatened to withhold almost $600,000 of the plaintiffs' pension benefits.  Id. ¶¶ 24-25.  The complaint also alleges that the defendants failed to comply with the plaintiffs' employment agreements regarding termination notice and procedures.  Id. ¶ 22.

The complaint further alleges that the defendants had a systematic practice of transferring and merging benefits accrued under the Restoration Plan into the qualified plan, a policy upon which the plaintiffs allegedly relied.  Id. ¶¶ 27-28.  The defendants instead treated the benefits accrued under each plan as separate, allegedly misleading the plaintiffs and breaching the fiduciary duty the defendants owed to them as administrators of the pension plans.  Id. ¶¶ 27, 35-37.

The plaintiffs requested information and documents related to the Restoration Plan on several occasions and claim that the defendants did not provide them.  Id. ¶¶ 40-41.  The defendants treated these requests for documents as a claim for benefits under the Restoration Plan.  Id. ¶ 42.

## II.   STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure examines the legal sufficiency of a complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual allegations must be sufficient to make the claim for relief more than just speculative.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In

---

[3]  The Plan provides that eligibility for benefits ceases if a party entitled to benefits voluntarily ends employment.  As stated on page 3 of the Plan, "a Participant who voluntarily terminates employment with the Hospital before attaining age 65 or Total and Permanent Disability shall not be eligible to receive any benefits under this Plan."  See Def. Exh. C.

determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which he bases his claim. Conley, 355 U.S. at 47. Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. Id. The "complaint must allege facts suggestive of [the proscribed] conduct." Twombly, 550 U.S. at 564. Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true. See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995). A complaint, however, "must satisfy . . . the simple requirements of Rule 8(a)." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 513 (2002). Following the Supreme Court's decision in Twombly, Rule 8(a) now requires that the facts in a complaint plausibly suggest that the pleader is entitled to relief. Accordingly, to state a claim, plaintiffs must state enough factual matter, taken as true, to suggest the required element, which does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

## III.   <u>DISCUSSION</u>

### A.  Extraneous Documents

The defendants have attached to their motion to dismiss several exhibits which the plaintiffs contend should not be considered here.  These documents include emails and letters between counsel, and a copy of the Restoration Plan.  The plaintiffs do not challenge the authenticity of these exhibits.  A district court may consider certain narrowly defined types of material without converting the motion to dismiss to a summary judgment motion, including items that are integral to or explicitly relied upon in the complaint.  <u>In re Rockefeller Center Properties, Inc. Securities Litig.</u>, 184 F.3d 280, 287 (3d Cir. 1999).  A court may also consider an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).  This prevents a plaintiff with a deficient claim from surviving a motion to dismiss by simply not attaching a dispositive document.  <u>Id.</u>  When a plaintiff is aware of a document prior to filing a complaint, the concern over his lack of notice is eliminated, and the document can be considered.  <u>Id.</u> at 1196-1197.  As the Third Circuit Court of Appeals explained:

> The reason that a court must convert a motion to dismiss to a summary judgment motion if it considers extraneous evidence submitted by the defense is to afford the plaintiff an opportunity to respond. When a complaint relies on a document, however, the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished.

<u>Id.</u>  Moreover, a court may consider "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  <u>Pryor v. Nat'l Coll. Athletic Ass'n</u>, 288 F.3d 548, 560 (3d Cir. 2002).

Here, the plaintiffs allege:

> When an employment dispute arose between the parties in 2008, they entered into negotiations in an attempt to resolve the dispute under terms agreeable to both sides. However, Saint Luke's abruptly ended negotiations to resolve the employment dispute before the parties came to an agreement on the terms and conditions of the proposed solution, and terminated Plaintiffs' employment with Saint Luke's on November 30, 2008.

<u>See</u> Compl. ¶ 21.  All remaining facts, allegations, and defenses stem from this alleged employment dispute between the parties.  It is the foundation of this action.  All of the plaintiffs' claims are based on their alleged understanding that Saint Luke's abruptly terminated their employment after negotiations failed to resolve a dispute.  It is curious that, although the plaintiffs attached twenty exhibits to their complaint, not one of those exhibits provides any background or explanation of this central event of involuntary termination.  In fact, the majority of the plaintiffs' attached exhibits are dated well after November 30, 2008, the date of the alleged termination.

Thus, the plaintiffs allege an employment dispute, subsequent negotiations, and an involuntary termination, and none of their attached exhibits provide a context for these allegations.  The defendants, on the other hand, attached to their motion several documents which provide a background of the dispute the plaintiffs allege, and

memorialize the parties' negotiations.  Attached as Exhibit A to the motion is an email

chain between counsel for the defendants and counsel for the plaintiffs, all with dates in

June and July 2008.  Of particular interest is an email sent to plaintiffs' counsel dated

June 17, 2008, by the defendants' Associate General Counsel that states,

> Your clients have *expressed repeatedly their desire to
> terminate their employment with [Saint Luke's] and enter
> into private practice.  . . .  However, a participant who
> voluntarily terminates his/her employment before the age
> of 65 forfeits all rights under the plan.  Since your *clients
> have chosen to terminate* their employment with [Saint
> Luke's], they will not be entitled to any benefits – and we
> are unable to make any payments – under the plan.

See Document #6-3 at 3 (emphasis added).  Also, attached as Exhibit B to the motion is a

copy of a letter dated September 12, 2008 from counsel for the plaintiffs to the

defendants' Associate General Counsel, which states:

> (2) Pursuant to our previous agreement of June 17, 2008,
> both parties mutually agreed that Drs. Sarno and Feinstein
> would continue their employment with [Saint Luke's]
> until November 30, 2008 and Drs. Sarno and Feinstein
> would be permitted to cease their employment with [Saint
> Luke's] on November 30, 2008 provided they provided
> written notice by November 1, 2008.  **Pursuant to the
> agreement, please allow this correspondence to serve
> as notice that Drs. Sarno and Feinstein have decided to
> end their employment with [Saint Luke's] as of
> November 30, 2008.**

See Document #6-4 at 1 (emphasis in original).  Though labeled an employment dispute

by the plaintiffs in the complaint, the evidence in these challenged exhibits paints the

more accurate picture of the parties working out details for an orderly transition period

during the inevitable voluntary departure of the plaintiffs who, up until then, had been a

7

major faction of the hospital's perinatology department.  These documents describe the alleged "employment dispute" and negotiations, and are thus integral to the complaint and relied upon by the plaintiffs in forming their allegations in the complaint.[4]  Pryor, 288 F.3d at 560; see also In re Rockefeller Center Properties, 184 F.3d at 287. Accordingly, because the plaintiffs do not dispute the authenticity of the documents attached to the motion to dismiss, and because the documents are integral to the complaint, I find that the documents may be properly considered at this stage of the proceedings, without converting the motion to one for summary judgment.

It is interesting to note that as early as June 17, 2008, the defendants indicated in an email to the plaintiffs that the plaintiffs had *repeatedly* expressed their desire to terminate their employment and enter into private practice.  See Document #6-3 at 3. There is no email response from the plaintiffs refuting that understanding.  Further, on September 12, 2008, counsel for the plaintiffs confirmed that both sides had *mutually agreed* that Drs. Sarno and Feinstein would continue their employment with the defendants until November 30, 2008.  See Document #6-4 at 1.  Also in that letter, the plaintiffs provided the requested notice to the defendants that they had decided to terminate their employment with Saint Luke's as of November 30, 2008.  This is in direct contravention to their allegation in the complaint that they had been involuntarily

---

[4]  For example, the plaintiffs repeatedly allege that the defendants used the threat of lost benefits as leverage in an employment dispute between the parties.  See Compl. ¶¶ 37, 67, 140, 156.  This allegation is directly based on the email from defendants' counsel sent to plaintiffs' counsel dated June 17, 2008.  See Document #6-3 attached to the defendants' motion to dismiss. In fact, the plaintiffs explicitly referenced this email in Paragraph #67, but did not attach a copy of the email to the complaint.

terminated by the defendants on November 30, 2008. It is also telling that well in advance of this letter, the plaintiffs were reminded by the defendants that, should they voluntarily leave their employment, they would not be entitled to benefits under the Restoration Plan. See Document #6-3 at 3. It seems more than a little disingenuous to allege otherwise in this complaint.

Nevertheless, the plaintiffs respond by citing language in the correspondence which indicates that the various proposals found in the defendants' exhibits were "not binding" on the parties, and that the documents did "not constitute an obligation or commitment" on the part of either side to enter into a definitive agreement with the other.[5] I understand that these missives represent negotiations[6] conducted to ensure the orderly transition after the departure of the plaintiffs from the hospital. Nothing the plaintiffs cite, however, affects the one important fact which runs consistently through the parties' communications: the plaintiffs desired to enter into private practice and voluntarily terminated their employment with the defendants. That detail remains unrefuted.

---

[5] If the contents of these exhibits only represent non-binding negotiations, as the plaintiffs insist, it is curious that no document has surfaced in which the plaintiffs retracted their resignations during the period between September 12, 2008 and November 30, 2008.

[6] These negotiations included the retention of the physicians' medical staff privileges once they entered into private practice; the use of inpatient space following the conclusion of the non-compete period; the potential hiring of Saint Luke's staff members the physicians wanted to include in the new private practice; whether to waive the non-compete clauses in the physicians' employment contracts; and how the five-mile restriction would be calculated for purposes of finding a suitable location for the physicians' private offices. The details of these negotiations are not important here, but as a whole they bolster the finding that the allegation of involuntary termination is shockingly less than accurate.

### B.  Count One – Request for injunctive relief

In Count One, the plaintiffs request "immediate injunctive relief" to enjoin the

defendants from adjudicating their claim for benefits under the Restoration Plan.  They

argue that they did not make a claim for benefits, but rather requested documents about

the Plan.  On September 22, 2010, however, the defendants sent counsel for the plaintiffs

notice that the plaintiffs' claims under the Restoration Plan had been denied.  <u>See</u>

Document #6-6.  Accordingly, because this claim is now moot, I will grant the

defendants' motion to dismiss Count One seeking injunctive relief.

### C.  Count Two – Failure to comply with ERISA disclosure requirements

In Count Two, the plaintiffs seek statutory penalties against the Plan's

administrator for failing to provide requested Plan documents in accordance with 29

U.S.C. § 1132(c).  A plan administrator has a duty to provide certain plan-related

documents upon request to any plan participant.  29 U.S.C. §§ 1024(b)(4), 1132(c).  A

plan administrator is defined by ERISA as "the person specifically so designated by the

terms of the instrument under which the plan is operated."  29 U.S.C. §1002(16)(A)(i).  A

plan participant is defined as an employee or former employee of the plan sponsor "who

is or may become eligible to receive a benefit" under the plan.  29 U.S.C. § 1002(7).  The

Supreme Court of the United States has stated that this definition includes a former

employee who has "a colorable claim that . . . he or she will prevail in a suit for benefits."

<u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 117 (1989).  The concept of a

colorable claim necessarily encompasses situations in which the requester has a

reasonable basis for believing that he or she has a meritorious claim but is in fact

mistaken.  Daniels v. Thomas & Betts Corp., 263 F.3d 66, 79 (3d Cir. 2001).

Although Saint Luke's Hospital of Bethlehem, Saint Luke's Hospital & Health Network of Pennsylvania, and the Administrators of Saint Luke's Hospital & Health Network Pension Plan are named as co-defendants in Count Two, they are not the administrators of the Plan, and as such had no duty to provide the plan-related documents to the plaintiffs under ERISA.  See 29 U.S.C. §§ 1024(b)(4), 1132(c).  Thus, the plaintiffs' claim against those three defendants must fail.  The plaintiffs have, however, properly included the Administrators of the Restoration Plan as a defendant.

Title 29 of the United States Code, Section 1132(c) permits the court to use its discretion in accessing penalties in the amount of up to $100 a day, or any other relief it deems proper when the court determines that a plan administrator is personally liable to a participant or beneficiary who has unsuccessfully requested plan documents.  See 29 U.S.C. § 1132(c).  When considering whether to award penalties against a plan administrator under 29 U.S.C. § 1132(c), a court may consider: (1) bad faith or intentional conduct of the plan administrator, (2) length of delay, (3) number of requests made, (4) documents withheld, and (5) prejudice to the participant.  Gorini v. AMP Inc., 94 Fed. Appx. 913 (3d Cir. 2004).

Here, the plaintiffs allege that they requested certain Plan documents from the defendants, specifically on November 13, 2009 and on March 4, 2010.  See Compl. Exh's F and G.  In the defendants' response to these requests dated May 17, 2010, the Plan Administrator sent a copy of the Restoration Plan and its amendments, all correspondence between the physicians and Saint Luke's regarding their employment

status, and the employment records of both physicians.  See Compl. Exh. H.  Thus, the

plaintiffs received the requested documents six months after their initial request, and four

months before their adjudication date of September 22, 2010.

I note that when the defendants sent the requested documents to the plaintiffs, they

informed the plaintiffs that they could request additional time if they needed it to provide

additional information in support of their claims.  Id.  The plaintiffs requested more time,

and the request was granted.  See Compl. Exh's I and J.  There is no indication that the

defendants withheld any of the documents requested, or that the delay was the result of

bad faith on the part of the Plan Administrator.  Given these circumstances, it is unlikely

that the plaintiffs were prejudiced by the delay.  Accordingly, I will grant the defendants'

motion to dismiss Count Two for failure to state a claim upon which relief can be

granted.

### D.  Count Three – Request for declaratory relief

ERISA provides that a plan participant and/or beneficiary may bring a civil action

"to recover benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

See 29 U.S.C. § 1132(a)(1)(B).  In seeking a declaratory judgment in Count Three, the

plaintiffs assert claims for benefits under the Restoration Plan alleging that they are

entitled to these benefits because their rights vested upon the involuntary termination of

their employment and also because the accrued Restoration Plan benefits "were merged

and vested with the Qualified Plan benefits."  I disagree.

First, it has already been determined that the plaintiffs' employment was not

involuntarily terminated by the defendants.  Thus, their entitlement to Restoration Plan

benefits under this argument fails.

Second, the plaintiffs point to a memorandum distributed by Saint Luke's Human

Resources Department which the plaintiffs claim demonstrates that Saint Luke's merged

and vested all benefits from the Restoration Plan into the Qualified Plan.  See Compl.

Exh. A.  A careful reading of that memorandum belies this claim.  The memorandum

indicates, in pertinent part:

> On March 27, 2000, the Board of Trustees voted to move all
> benefits accrued under the restoration plan *through
> December 31, 1999* into the qualified pension plan. . . .  Our
> *intent* is to move benefits accrued under the restoration plan
> through December 31, 2002 into the qualified plan in 2003.

Compl. Exh. A (emphasis added).  This memorandum clearly indicates that the benefits

accrued under the Plan through December 31, 1999 were moved into the qualified

pension plan.  There is no indication of the merging of the plans, no indication that the

two plans were administered in tandem, and no promise that this transfer would ever be

repeated.  It was a one-time exemption.  That the defendants intended to repeat the

transfer in the future is of no import here.  The defendants argue that the practice became

impossible because of newly-enacted provisions of the Internal Revenue Service Code.

As further support, the plaintiffs cite a slide-show presentation used by the

defendants to explain the Plan to eligible employees.  See Compl. Exh. C.  This evidence

also provides the plaintiffs no relief.  On page six, there is an "Update effective

12/31/99," which explains that on December 31, 1999, the "accrued restoration benefit"

became "protected under the qualified plan," and those benefits were "vested without the

tax implications associated with restoration plan vesting (qualified plan benefits are taxed when paid)." Id. at 6. This update describes one vesting of benefits and makes no other claim of future vesting or merging of the two pension plans.

The plaintiffs further seek a declaration requiring the "Defendants to revise the terms of the Saint Luke's Pension Plan to conform with their representations regarding the transfer and merger of Restoration Plan benefits into the Saint Luke's Qualified Pension Plan." Besides recognizing that the plain language of the Plan precludes the plaintiffs from recovering benefits under these circumstances, this claim has no merit.

The plaintiffs repeatedly allege that they had been assured that the two plans were merged and work in tandem, and that the Plan's benefits would be transferred, merged, protected, vested, and paid under the qualified pension plan. See Compl. ¶¶ 27, 28, 29, 31, 32, 38, 50, 54, 61, 75, 93, 100, 101, 111, 112, 118, 125, 127, 133, 145, 152, 156, 158, 160, 161. The plaintiffs point to no evidence which supports these bald assertions. The fact remains that the defendants have two separate pension plans, i.e., a qualified pension plan and a non-qualified pension plan. Nothing the plaintiffs cite proves otherwise. The Restoration Plan was created in response to revisions in the IRS Code that lowered the maximum salary that a qualified pension plan could recognize when determining an employee's pension benefit. The Plan was adopted by the defendants to "restore" the amounts that would have been paid into the qualified pension plan but for the new IRS limitations. Thus, if it were legal to merge the benefits of the two plans, the Restoration Plan would be unnecessary.

Accordingly, because the plaintiffs have failed to show that they are entitled to

14

recover any benefits under the Plan either due to the termination of their employment or to the merging of the two pension plans, I will grant the defendants' motion to dismiss Count Three.

### E.  Count 4 – Breach of fiduciary duty under ERISA

In Count Four, the plaintiffs allege that the defendants breached fiduciary duties owed to them under the Plan.  In the Third Circuit, a claim for breach of fiduciary duty must be based on either a misrepresentation or an omission.  In re Unisys Corp Retiree Medical Benefits ERISA Litigation, 579 F.3d 220, 228 (3d Cir. 2009).  To establish a claim for breach of fiduciary duty, a plaintiff must demonstrate that: (1) the defendant was acting in a fiduciary capacity; (2) the defendant made affirmative misrepresentations or failed to adequately inform plan participants and beneficiaries; (3) the misrepresentation or inadequate disclosure was material; and (4) the plaintiff detrimentally relied on the misrepresentation or inadequate disclosure.  Id.

Here, the plaintiffs allege that the defendants misled and misinformed the plaintiffs "to the extent that there was a substantial likelihood" that these misrepresentations "would mislead a reasonable employee in making an adequately informed retirement decision."  See Compl. ¶ 110.  Specifically, the plaintiffs allege that the defendants misled them to believe that benefits under the Plan would be "transferred, merged, protected, vested, and paid under the Saint Luke's Qualified Pension Plan."  I have already determined that the plaintiffs have failed to show that the defendants indicated that the transfer would happen any more than one time, i.e., on December 31, 1999.  Accordingly, the plaintiffs have failed to show that the defendants made an

affirmative misrepresentation or failed to inform participants adequately about the Plan.

I also note that, even if the plaintiffs successfully established the second requirement, they have failed to establish the fourth requirement for a breach of fiduciary duty, i.e., that the plaintiffs detrimentally relied on the alleged misrepresentation or inadequate disclosure. The plaintiffs cannot claim detrimental reliance here because the defendants specifically warned the plaintiffs that if they voluntarily terminated their employment before the age of sixty-five, they would forfeit all rights to benefits under the Plan. See Document #6-3 at 3. Notwithstanding this information, the plaintiffs terminated their employment with the defendants on November 30, 2008. There can be no reliance on the alleged misrepresentation under these circumstances.

Next, I note that the parties have indicated in their responses and at the hearing that the Plan could be considered a "top hat" plan. A "top hat" plan "is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." Goldstein v. Johnson & Johnson, 251 F.3d 433, 435 (3d Cir. 2001); see also ERISA §§ 201(2), 301(a)(3), 401(a)(1); 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). This type of plan is not subject to the funding, participation, vesting or fiduciary standards applicable to other employee benefit plans," see Miller v. Eichleay Eng'rs, Inc., 886 F.2d 30, 34 n.8 (3d Cir. 1989), but is covered by ERISA's administrative and enforcement provisions, see In re IT Group, Inc., 448 F.3d 661, 664-65 (3d Cir. 2006). Further, it is well established that there is no cause of action for breach of fiduciary duty involving a "top hat" plan. Goldstein, 251 F.3d at 443 (citing In re New Valley Corp., 89 F.3d 143, 153 (3d Cir. 1996)). The

Department of Labor has expressed the view that employees eligible to participate in "top hat" plans are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees. Goldstein, 251 F.3d at 442 (citing DOL Opin. Letter 90-14 A at *1 (May 8, 1990)).

The plaintiffs insist that even though the Plan might possibly be considered a "top hat" plan and thus not subject to fiduciary duties, the allegations in the complaint also relate to the Saint Luke's Qualified Plan which is subject to those duties imposed by ERISA. That determination is not dispositive here because even if the Plan Administrator were found to have owed the plaintiffs a fiduciary duty, the plaintiffs have failed to establish the requirements for a breach of that duty. Accordingly, I will grant the defendants' motion to dismiss Count Four.

### F.  Count Six – Unlawful Actions/Omissions in violation of ERISA

Count Six alleges that the defendants violated Section 510 of ERISA, 29 U.S.C. § 1140, by interfering with rights and/or with the attainment of rights to which the plaintiffs may be entitled under the defendants' pension plans. See Compl. ¶ 139. Section 510 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this title, section 3001 [29 USCS § 1201], or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this title, or the Welfare and Pension Plans Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against

> any person because he has given information or has
> testified or is about to testify in any inquiry or proceeding
> relating to this Act or the Welfare and Pension Plans
> Disclosure Act. In the case of a multiemployer plan, it
> shall be unlawful for the plan sponsor or any other person
> to discriminate against any contributing employer for
> exercising rights under this Act or for giving information
> or testifying in any inquiry or proceeding relating to this
> Act before Congress. The provisions of section 502 [29
> USCS § 1132] shall be applicable in the enforcement of
> this section.

See 29 U.S.C. § 1140.  By its terms, Section 510 protects plan participants from

termination motivated by an employer's desire to prevent a pension from vesting.

Ingersoll-Rand, 498 U.S. at 143; see also Becker v. Mack Trucks, Inc., 281 F.3d 372, 382

(3d Cir. 2002) (noting that § 510 was enacted to prevent "unscrupulous employers from

discharging or harassing their employees in order to keep them from obtaining vested

pension benefits").  Congress viewed this section as a crucial part of ERISA because,

without it, employers would be able to circumvent the provision of promised benefits.

Ingersoll-Rand, 498 U.S. at 143.  The Supreme Court characterized this kind of claim as

"prototypical of the kind Congress intended to cover under § 510."  Id.

    To prove a Section 510 claim, a plaintiff does not have to prove that the only

reason he or she was subjected to one of that section's unlawful actions was the

defendant's intent to interfere with the plaintiff's pension benefits.  However, a plaintiff

must "demonstrate that the defendant had the 'specific intent' to violate ERISA."

Jakimas v. Hoffmann La Roche, Inc., 485 F.3d 770, 785 (3d Cir. 2007).  The plaintiff

must show that "the employer made a conscious decision to interfere with the employee's

attainment of pension eligibility or additional benefits."  Id.  Proof of specific intent may

18

be demonstrated through direct or circumstantial evidence.  However, where there is no direct evidence, courts use a burden-shifting analysis whereby plaintiff must first establish a *prima facie* case by showing: (1) the employer committed prohibited conduct (2) that was taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.  Jakimas, 485 F.3d at 785.

Here, the plaintiffs allege that the defendants' § 510 violations include "using the threat of lost benefits as leverage in an employment dispute between the parties; failing to act in the interest of plan beneficiaries; revoking Plaintiffs' medical staff privileges at Saint Luke's; improperly withholding benefits, plan documents, and other requested information from the Plaintiffs; construing requests for pension plan documents as claims for benefits under arguably inapplicable terms; moving forward with adjudication under inapplicable terms despite Plaintiffs' objections to the same; and/or engaged in other prohibited conduct for the purpose of interfering with rights and/or with the attainment [of] rights to which the Plaintiffs, as plan participants and beneficiaries, are, or may become entitled under an employee benefit plan."  See Compl. ¶ 140.  None of these allegations involve the prohibited conduct outlined in the statute.  There is no allegation that the defendants discharged, fined, suspended, expelled, disciplined, or discriminated against the plaintiffs.  The plaintiffs seek benefits that did not vest under the plain language of the Plan because of their voluntary termination.  The defendants did not threaten the plaintiffs with the loss of benefits but instead explained to them that voluntary termination before the age of sixty-five would result in their losing any accrued benefits.  Thus, because they do not satisfy the first element, the plaintiffs' Section 510

claim fails.

I also note that the remedies the plaintiffs seek in Count Six are not available for §
510 violations.  Remedies available for a violation of § 510 are limited to those set forth
in § 502(a) of ERISA, 29 U.S.C. § 1132(a).  Ingersoll-Rand, 498 U.S. at 143; see also
Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987); Mass. Mut. Life Ins. Co. v.
Russell, 473 U.S. 134, 146 (1985).  The Third Circuit Court of Appeals has held that
actions for violations of § 510 must be brought under § 1132(a)(3), and may not be
brought under § 1132(a)(1)(B).  Eichorn v. AT&T Corp., 484 F.3d 644, 652-654 (3d Cir.
2007).  Subsection (a)(1)(B) provides remedies only against a defendant who has failed to
comply with the terms of a benefits plan.  Id. at 653.  It allows plaintiffs to collect
benefits "due under the terms of the plan" or to enforce "rights under the terms of the
plan."  Id.  Here, in Count Six, the plaintiffs allege that the defendants interfered with
rights and/or with the attainment of rights to which the plaintiffs may be entitled, not that
the defendants have breached the terms of the Plan itself.  Thus, the plaintiffs' § 510
claim for interference with benefits is not enforceable under § 502(a)(1)(B).  Id. at 654.

On the other hand, Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), provides
that "A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A)
to enjoin any act or practice which violates any provision of this subchapter or the terms
of the plan, or (B) to obtain *other appropriate equitable relief* (i) to redress such
violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.
The Supreme Court held that the phrase "appropriate equitable relief" means only "those
categories of relief that were typically available in equity" in the days of the divided

20

bench.  <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 210 (2002)

(quoting <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 256 (1993)).  Such relief includes

"injunction, mandamus, and restitution, but not compensatory damages."  <u>Mertens</u>, 508

U.S. at 256.  Thus, a plaintiff seeking relief under ERISA § 502(a)(3) must tie that

request to a form of relief typically available in equity.

Here, the plaintiffs seek the "court to (a) enter judgment in favor of plaintiffs

against defendants in an amount equal to or exceeding the $592,000.00 value of the

withheld benefits; (b) award plaintiffs attorneys' fees, costs, and pre-judgment interest in

this action and any action to enforce an Order or judgment entered in this action; and (c)

grant such other legal, equitable, or remedial relief as the court may deem appropriate."

<u>See</u> Comp. ¶ 143.  Notwithstanding the passing mention in (c) of the word "equitable,"

the remedies sought here are legal in nature available under § 502(a)(1)(B), and thus are

inconsistent with the remedies available for § 510 claims.

Accordingly, I will grant the defendants' motion to dismiss Count Six.

**G.  <u>Preemption</u>**

The plaintiffs' state law claims related to the Plan are governed by ERISA, and are

completely preempted by ERISA.  Congress enacted ERISA to provide a uniform

regulatory scheme over claims under ERISA plans.  <u>See</u> 29 U.S.C. § 1001(b).  To

effectuate this goal, Congress included in the ERISA statute an expansive preemption

provision.  <u>See</u> 29 U.S.C. § 1144(a).  This section of the statute provides:

> Except as provided in subsection (b) of this section, the
> provisions of this subchapter and subchapter III of this
> chapter shall supersede any and all State laws insofar as

they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

A state law "relates to" a benefit plan and is therefore preempted if "it has a connection with or reference to such a plan." Metro. Life Ins. Co. v. Massachusetts, 471 U.S. 724, 739 (1985); see also Pilot Life, 481 U.S. at 44.  The preemption provision was intended to displace all state laws that fall within its sphere, even including state laws that are consistent with ERISA's substantive requirements.  McMahon v. McDowell et al., 794 F.2d 100, 106 (3d Cir. 1986).  It is also important to note that the ERISA preemption has been held to encompass "actions for fraud, negligence, breach of contract, and unjust enrichment which relate to an employee benefit plan.  Lynn v. Jefferson Health System, 2010 U.S. Dist. LEXIS 96378, *3 (E.D. Pa. September 14, 2010).  In fact, the Supreme Court has held, "Any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted.  Aetna Health, Inc. v. Davila, 542 U.S. 200, 209 (2004).

     1.  Count Five – Breach of fiduciary duty & of loyalty under common law

State law actions for breach of fiduciary duty have been held to be preempted by ERISA.  See Mitnik v. Cannon, 784 F.Supp. 1190, 1194-95 (E.D. Pa. 1992), aff'd, 989 F.2d 488 (3d Cir. 1993); Kineg ex rel. Springer v. Hartford Life & Acc. Ins. Co., 2005 U.S. Dist. LEXIS 8142, *5 (E.D. Pa. May 4, 2005).  The plaintiffs' common law claim in Count Five is related to the Restoration Plan, and is thus preempted by ERISA.

### 2. Counts Seven & Eight – Claim for Benefits Promised by Deceptive Employer and Claim for Promissory estoppel

In Counts Seven and Eight, the plaintiffs seek payment of plan benefits as damages.  Accordingly, these state law claims "relate to" the Restoration Plan, and are preempted.

### 3. Count Fourteen - Violation of the PA Wage Payment and Collection Law

The plaintiffs' final claim in the complaint is brought under the Pennsylvania Wage Payment and Collection Law, which provides a remedy for employees to recover wages that are contractually due.  Hartman v. Baker, 766 A.2d 347 (Pa. Super. 2000). The plaintiffs are relying on this statute in seeking "employee benefits, pension plan benefits [and] supplemental pension plan benefits."  Compl. ¶ 222.  Thus, this claim relates to the Restoration Plan, and is entirely preempted by ERISA.

## H.  Counts Nine through and including Thirteen – State Law Claims

I have dismissed all of the claims over which I have original jurisdiction.  The remaining counts in the complaint are state law tort claims.  In Counts Nine and Ten, Dr. Feinstein and Dr. Sarno, respectively, bring a claim for breach of the employment contract with Saint Luke's.  See Compl. ¶¶ 163-178.  In Count Eleven, the plaintiffs bring a claim for tortious interference with business relationships.  Id. at ¶¶ 179-194.  In Counts Twelve and Thirteen, Dr. Feinstein and Dr. Sarno, respectively, bring a claim for breach of contract/bylaws.  Id. at ¶¶ 195-208.  Accordingly, I decline to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Counts Nine through Thirteen.  I remind the parties that 28 U.S.C. § 1367(d) provides that "the period of limitations for

any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of thirty days after it is dismissed unless State law provides for a longer tolling period."

An appropriate Order follows.